Affirmed by published opinion. Judge DIAZ wrote the opinion, in which Judge SHEDD joined. Judge DAVIS wrote a separate opinion concurring in part and in the judgment.
OPINION
DIAZ, Circuit Judge:
Mantel Delance Mubdi entered a conditional guilty plea to drug and firearms offenses, reserving the right to challenge the district court’s denial of his motion to suppress evidence seized during a traffic stop. The district court sentenced him to 300 months’ imprisonment. On appeal, Mubdi contends that the district court erred in denying his motion to suppress because the officers who stopped his car did not have probable cause to execute the stop. As an alternative ground for suppression, he contends that the officers unlawfully prolonged the traffic stop to conduct an open-air canine sniff of his car. Mubdi also argues that the district court erred in increasing his statutory mandatory minimum sentence for the drug offenses based on improper judicial factfinding. Finding no error, we affirm.
I.
A.
On the morning of September 30, 2008, Mubdi was driving a gray Dodge Magnum northbound on Interstate 77 near States-ville, North Carolina. In the car with Mubdi was Markus Parham. Two States-ville Police Department Officers, Jason York and Phillip Wolfe, were parked in marked police cruisers perpendicular to the highway about ten yards from the right-hand side of the northbound lanes near exit 50.[1] As Mubdi approached the *337 officers, they each visually determined that he was driving above the posted speed limit of fifty-five miles per hour.
York observed a group of ears in front of Mubdi’s car traveling the speed limit, and he noticed that Mubdi was closing in on the group. He tracked Mubdi’s car for about a hundred yards to estimate its speed at sixty-three or sixty-four miles per hour. Wolfe likewise noticed Mubdi’s car gaining on the cars in front of it and pulling away from the cars behind it; he estimated Mubdi’s speed at sixty-five miles per hour. Because of the angle at which the officers were parked, they were unable to verify their estimates with radar equipment. However, York and Wolfe had both passed a radar certification class that, among other things, provided training on how to visually estimate the speed of vehicles within a narrow margin of error.
The radar certification course constitutes a minimum of thirty-two hours of training, which includes sixteen hours of “supervised field practice where [officers] learn how to estimate the speed of vehicles and how to operate the radar units properly and to check off and set up the instrument and test for accuracy.” J.A. 106. Estimating speed is a mandatory part of the certification process. Officers are trained to estimate speeds both from a stationary position and while in motion. An officer may err on any given estimate (or, indeed, all of them) and still receive certification, provided that he errs in the aggregate no more than forty-two miles per hour over twelve separate speed estimates (an average margin of error of three and a half miles).
York and Wolfe pursued Mubdi for a few miles as he merged from Interstate 77 onto Interstate 40 heading west.[2] Wolfe passed Mubdi’s car in the left lane in an attempt to see whether its occupants were wearing seatbelts. Mubdi then merged behind Wolfe to pass a truck in the right lane. York, trailing Wolfe and Mubdi, determined that Mubdi was following Wolfe’s patrol car at a distance of no more than two to three car lengths, contrary to the North Carolina Highway Patrol’s recommendation that motorists keep at least a one car length interval per ten miles per hour of speed.[3]
At that point, York activated his blue lights to initiate a traffic stop. After what struck York as “an extended amount of time,” id. 163, Mubdi pulled over to the side of the road. York approached the car and asked for Mubdi’s driver’s license and registration. He observed that Mubdi kept his foot on the brake pedal, instead of shifting the transmission to park and releasing the brake. Mubdi handed York a plastic pouch containing his license and a *338 vehicle rental contract. York saw that Mubdi’s “hands were shaking more so than an average person would be shaking for just a routine traffic stop” and that Mubdi looked scared. Id. 165-66. York asked Mubdi whether he had rented the car, and Mubdi said that he had. In response to York’s questions regarding the purpose of Mubdi’s travel, Mubdi said he was headed to his grandfather’s funeral in Statesville and to his aunt’s house. Mubdi, however, could not tell York his aunt’s name or where she lived.
York returned to his patrol car to review Mubdi’s license, insurance, and rental contract, and to issue Mubdi a warning ticket for speeding and following too closely. The rental contract showed that the car had in fact been rented to Latonyia Brathwaite, other drivers were explicitly forbidden from driving it, and the car was not permitted to travel outside of Georgia. All told, it took York approximately fifteen minutes to review Mubdi’s paperwork and to issue the warning ticket, a time frame he described as typical. In the interim, Wolfe, along with his drug-sniffing canine, arrived on the scene.
After York completed the warning ticket for speeding and following too closely, he approached Mubdi’s car to issue the citation. He asked Mubdi to roll up the windows, turn off the engine, and step out of the ear. Mubdi complied but did not shift the transmission into park. As a result, the car began rolling away before Parham, still seated in the passenger seat, stopped it. York explained the warning ticket and then told Mubdi that Wolfe’s dog would conduct an open-air sniff around the car.
Captain Jacob Dyson, who arrived on the scene for backup, approached the passenger’s side of the car, knocked on the window, and asked Parham to get out. Parham just looked at him, so Dyson tried the door handle. Parham then rolled down his window, and, when Dyson again asked him to get out of the car, Parham responded, “What for? I don’t have a gun.” Id. 113. When Parham started to reach between his legs to the floorboard, Dyson feared that he was reaching for a firearm and unsnapped his holster. Par-ham, however, got out of the car without incident, and both he and Mubdi consented to a pat-down for weapons. Shortly thereafter, Wolfe’s dog conducted the open-air sniff and alerted. A search of the car uncovered crack and powder cocaine, as well as two loaded firearms, one under each front seat.
B.
A grand jury returned a superseding indictment charging Mubdi with conspiracy to distribute and to possess with intent to distribute a quantity of cocaine and at least fifty grams of cocaine base, in violation of 21 U.S.C. § 846, possession with intent to distribute a quantity of cocaine and at least fifty grams of cocaine base, in violation of 21 U.S.C. § 841(a), (b)(1)(A), (b)(1)(G), possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c), and possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e).
Mubdi moved to suppress the drugs and firearms on the grounds that the officers lacked probable cause to make a traffic stop, lacked reasonable suspicion to prolong the stop to conduct the canine open-air sniff, and conducted an illegal warrant-less search of the car.[4] The district court denied Mubdi’s motion. First, the court found that the officers had probable cause to make the traffic stop because Mubdi *339 was speeding and following too closely. As to the first ground, the court concluded that York and Wolfe were trained in visually estimating vehicle speed and that their testimony regarding Mubdi’s rate of speed was credible. After crediting the officers’ testimony and reviewing the video recording of Mubdi changing lanes, the district court further found that the officers had probable cause to stop Mubdi for following too closely.
The court also determined that the duration of the stop was reasonable, particularly given the objective facts that piqued the officers’ growing suspicions. Finally, the court found that the ensuing search of the car was proper on two independent grounds: (1) Mubdi and Parham did not have a reasonable expectation of privacy in the car in that neither of them was an authorized driver on the rental contract, and (2) the officers were justified in searching the car based on the canine alert and Mubdi’s and Parham’s behavior.[5]
Mubdi entered a conditional guilty plea to all charges, reserving the right to appeal the denial of his suppression motion. At the sentencing hearing, the district court adopted the Presentence Investigation Report setting Mubdi’s offense level at thirty and his criminal history category at IV. Mubdi’s Guidelines sentence was 240 months on the drug charges, due to the government’s filing of a notice of its intent to seek an enhanced punishment under 21 U.S.C. § 851. The district court imposed this sentence and a term of 120 months on the possession of a firearm by a felon charge, to run concurrently. Additionally, the district court imposed a mandatory consecutive sixty-month sentence on the § 924(c) charge, yielding a total term of 300 months’ incarceration. Mubdi timely appealed.
II.
In considering the district court’s denial of a motion to suppress, we “review the district court’s legal determinations de novo and its factual determinations for clear error.” United States v. Kelly, 592 F.3d 586, 589 (4th Cir.2010). When the district court has denied a suppression motion, we must “construe the evidence in the light most favorable to the government.” Id. We are also to “particularly defer to a district court’s credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress.” United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir.2008) (quotation omitted).
A.
Mubdi argues that the officers lacked probable cause to believe he was speeding or following too closely. The relevant law on this issue is well settled. Although a traffic stop may be brief and for a limited purpose, it constitutes a “seizure” under the Fourth Amendment and must “not be ‘unreasonable’ under the cir *340 cumstances.” Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Generally speaking, “the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.” Id. at 810, 116 S.Ct. 1769; see also United States v. Branch, 537 F.3d 328, 335 (4th Cir.2008) (“Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle.... ”). Probable cause exists if, given the totality of the circumstances, the officer “had reasonably trustworthy information ... sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.” Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).
1.
Mubdi first argues that there was no probable cause to stop him for speeding, notwithstanding that Officers York and Wolfe independently estimated that he was driving eight to ten miles above the posted speed limit.
We have intimated, albeit in an unpublished opinion, that an officer’s visual observation of a driver speeding may alone be sufficient to establish probable cause. See United States v. Daras, 164 F.3d 626, 1998 WL 726748, at *2 (4th Cir.1998) (per curiam) (unpublished table decision) (“[T]he Government correctly points out that the officer’s visual estimate is also sufficient, by itself, to support a conviction.”); see also United States v. Wornom, 754 F.Supp. 517, 519 (W.D.Va.1991) (affirming a magistrate judge’s conviction of a defendant for speeding based solely on an officer’s visual speed estimate after radar evidence was suppressed).
But we also recently concluded that “the Fourth Amendment does not allow, and the case law does not support, blanket approval for the proposition that an officer’s visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop.” United States v. Sowards, 690 F.3d 583, 591 (4th Cir.2012). In Sowards, this same district court denied a motion to suppress evidence seized following a traffic stop of the defendant’s vehicle, finding that the officer’s visual speed estimate (of seventy-five miles per hour in a seventy mile per hour zone) alone established probable cause to initiate the stop. Id. at 586-87.
We reversed, finding that it was clear error for the district court to discount as immaterial the officer’s obvious difficulty with measurements as it pertained to his ability to estimate the defendant’s speed. Id. at 590. Among other patent errors, the officer in that case testified that there are twelve feet in a yard, twelve inches on a yardstick, and the number of inches on a yardstick depends on the yardstick. Id. at 589-90. The officer nonetheless insisted his estimate was accurate in that he had tracked the vehicle for 100 yards. Because the record showed that the officer was, to put it mildly, measurement-challenged, we lacked confidence in his visual estimate, particularly given the modest five mile per hour differential between the posted speed limit and the defendant’s alleged speed. Id. at 593-94.
The Sowards majority noted that our starting point in such cases is to determine “whether a vehicle’s speed is estimated to be in significant excess or slight excess of the legal speed limit.” Id. at 591. For significant excesses of the legal speed limit, “the speed differential — i.e., the percentage difference between the estimated speed and the legal speed limit— may itself provide sufficient ‘indicia of reliability’ to support an officer’s probable *341 cause.” Id. at 591-92 (emphasis added). On the other hand,
where an officer estimates that a vehicle is travelling in only slight excess of the legal speed limit, and particularly where the alleged violation is at a speed differential difficult for the naked eye to discern, an officer’s visual speed estimate requires additional indicia of reliability to support probable cause.
Id. at 592. While “[s]uch additional indicia of reliability,” the opinion expounded, “need not require great exactions of time and mathematical skill that an officer may not have, ... they do require some factual circumstance that supports a reasonable belief that a traffic violation has occurred.” Id. at 593.
Sowards further suggested that certain techniques, such as “radar [or] pacing methods,” id. at 592-93, might suffice to corroborate an officer’s visual estimate in eases of slight excesses of the legal speed limit. The majority opinion nevertheless emphasizes, though, that the touchstone of the probable cause inquiry is — as always— reasonableness, and the analysis remains whether the “totality of the circumstances” establishes “the reasonableness of the officer’s visual speed estimate.” Id. at 592-93.[6]
Here, even assuming that Mubdi was only slightly exceeding the legal speed limit, the record supports the reasonableness of the officers’ visual speed estimates, and thus the decision to conduct the stop. Unlike in Sowards, we have before us two independent and virtually identical estimates as to Mubdi’s speed by officers who were required, as part of a radar certification class, to visually estimate the speed of vehicles within a narrow margin of error.[7] In our view, this tandem evidence alone provides sufficient corroboration to support a finding of probable cause, particularly where the record — again unlike the one in Sowards — does not cast a shred of doubt on the officers’ ability to estimate speed or on the accuracy of their visual estimates.
In sum, we discern no clear error in the district court’s conclusion that Mubdi was speeding, based on its separate factual findings that York and Wolfe were trained in estimating vehicle speed and that their testimony regarding Mubdi’s rate of speed was credible. Reviewing the probable cause determination de novo, we agree with the district court that the traffic stop was supported by the officers’ reasonable belief that Mubdi was speeding.
*342 2.
Mubdi also challenges the district court’s separate finding that his following too closely behind Wolfe’s patrol car justified the traffic stop. Mubdi rightly notes that the North Carolina statute proscribing motorists from following too closely, N.C. Gen.Stat. § 20-152, is inapplicable when a motorist is overtaking another. He contends that, because he was overtaking a slower-moving truck in front of him in the right lane when he merged behind Wolfe, his conduct was permissible. As such, Mubdi argues that the officers made a mistake of law by believing that he violated the statute. Tying up this argument, Mubdi asserts that the officers’ decision to stop him for following too closely was improper because “a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop.” Appellant’s Reply Br. 4 (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1279 (11th Cir.2003) (concluding that “an officer’s reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer’s mistake of law may not”)).
Mubdi’s argument here fails for two reasons. First, the evidence is at best conflicting as to whether Mubdi merged in the left lane behind Wolfe’s patrol car to overtake a slower-moving vehicle, a necessary precondition for his conduct to be permissible under the statute. On this point, Mubdi simply averred that “there was a truck in front of [him] and to get around it, [he] merged behind the officer that was on the side.” J.A. 269. On the other hand, York testified that “the Dodge Magnum ma[d]e a left behind [Wolfe] in a very close distance^ and] the truck [was] ... at least ten ear lengths in front of [Mubdi].” Id. 162. Additionally, Wolfe stated that he “wouldn’t say that [Mubdi] was getting ready to hit the truck or anything. They had plenty of time — they had more time to travel behind the vehicle before anything unsafe was to happen.” Id. 250. In fact, the traffic stop video, submitted as an exhibit to the motion, appears to bear out the officers’ testimony.
Viewing the evidence in the light most favorable to the government, as we must when a motion to suppress has been denied, Kelly, 592 F.3d at 589, Mubdi falls far short of showing that his conduct was permissible under section 20-152 in the first place.
But even assuming that the officers were mistaken as to the distance between Mubdi and the truck in front of him in the right lane, and thus whether Mubdi merged into the left lane to overtake the truck, such a mistake is patently a mistake of fact. Nothing in the record suggests that the officers were unaware that section 20-152 exempts drivers from the prohibition on following too closely while they are overtaking a slower-moving vehicle.
Thus, to the extent that the officers honestly — although perhaps mistakenly— believed that Mubdi was violating section 20-152 by following Wolfe too closely while not overtaking a vehicle, this mistake is at most a reasonable one under the circumstances, which does not undermine the district court’s conclusion that the officers had probable cause to execute the stop in the first instance. See Chanthasouxat, 342 F.3d at 1276 (“[I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.”).
Reviewing the probable cause determination de novo as it pertains to Mubdi’s following too closely, we agree with the district court that the traffic stop was justified on this basis as well.
*343 B.
We next analyze whether the officers’ subsequent actions were ‘“reasonably related in scope to the circumstances that justified the [stop].’ ” See United States v. Rusher, 966 F.2d 868, 875 (4th Cir.1992) (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Traffic stops must be limited in both scope and duration. See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). With respect to scope, “the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.” Id. As for duration, the police must “diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly.” United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); see also Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (noting that a traffic stop may become “unlawful if it is prolonged beyond the time reasonably required to complete [its] mission”); Royer, 460 U.S. at 500, 103 S.Ct. 1319 (noting that the scope of a seizure “must be carefully tailored to its underlying justification,” and that the government bears the burden to “demonstrate that the seizure it seeks to justify ... was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure”).
In the context of traffic stops, police diligence encompasses requesting a driver’s license and vehicle registration, running a computer check, and issuing a ticket. United States v. Foreman, 369 F.3d 776, 781 (4th Cir.2004); see also Branch, 537 F.3d at 337 (“If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle.”). If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver’s consent. Branch, 537 F.3d at 336. Additionally, “if the driver obstructs the police officer’s efforts in any way — for example, by providing inaccurate information — a longer traffic stop would not be unreasonable.” Id.
Addressing Mubdi’s argument that the officers unlawfully prolonged the stop, the district court concluded as follows:
The duration of the seizure was reasonable for the purpose of performing a routine traffic stop, particularly in light of the fact that it involved a determination of a rental contract which was submitted by the driver, Mr. Mubdi. The time of the detention for the purpose of the traffic stop was reasonable under the circumstances and the totality thereof. And it was further testified [sic] by the growing reasonable suspicion of the officers. So even taken as a gross amount of time, it’s still reasonable.
J.A. 338-39.
On appeal, Mubdi asserts that the officers lacked reasonable suspicion to detain him after York issued the warning ticket, which resulted in the warrantless search of his car that uncovered the drugs and firearms. We disagree.
First, the district court correctly concluded that the officers’ actions were no more intrusive than necessary and that they diligently pursued a means of investigation to confirm or dispel their suspicions. In Branch, we held that a traffic violation authorizes “a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop,” such as “requesting] a *344 driver’s license and vehicle registration, run[ning] a computer check, and issuing] a citation.” 537 F.3d at 335 (quotation omitted). The record reveals that York did not stray from this holding, as he asked Mubdi only “ordinary inquiries incident to a routine traffic stop,” id. at 338 (quotation omitted), and undertook his investigation expeditiously, completing the warning citation within fifteen minutes.[8]
The district court also correctly determined that the following suspicious behavior supported York’s decision to extend the investigation: (1) Mubdi took an excessive amount of time to pull over; (2) he was exceedingly nervous; (3) he kept his foot on the car brake instead of shifting the transmission into park; (4) he could not provide details as to his destination or the family member he intended to visit; (5) he did not rent the car, contrary to what he told York; (6) he was not authorized to drive the rental car; and (7) the car was beyond the bounds authorized by the rental contract.
Although some of these facts, viewed in isolation, might be consistent with innocent travel, the Supreme Court has recognized that such factors can, when taken together, give rise to reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (“Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.”). Here, we have no trouble concluding that the circumstances supported York’s decision to extend the stop to conduct the open-air canine sniff, which in turn alerted the officers to the presence of contraband in the car.
We have emphasized that reasonable suspicion “is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life.” United States v. Mason, 628 F.3d 123, 128 (4th Cir.2010) (quoting Foreman, 369 F.3d at 781). As a reviewing court, we “consider the totality of the circumstances and give due weight to common sense judgments reached by officers in light of their experience and training.” Id. (quotation omitted). On this record, we decline to disturb the district court’s order denying Mubdi’s motion to suppress.
III.
Lastly, Mubdi argues that the district court violated his Fifth and Sixth Amendment rights by increasing his statutory mandatory minimum sentence for the drug offenses based on improper judicial factfinding. Specifically, Mubdi contends that the district court’s finding that he was responsible for 290.5 grams of crack cocaine violated his Fifth and Sixth Amendment rights to have any fact that triggers an enhanced mandatory minimum sentence charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt. Without this finding, Mubdi argues that his guilty plea to crimes involving at least fifty grams of crack cocaine would have yielded only a ten-year mandatory minimum sentence. However, Mubdi acknowledges that Supreme Court precedent forecloses this argument. See Harris v. United States, 536 U.S. 545, 568, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (holding that increasing minimum sentence based on judicial factfinding “does not evade the re *345 quirements of the Fifth and Sixth Amendments”).
Accordingly, we affirm the district court’s imposition of a 240-month sentence for Mubdi’s drug convictions, which, when combined with the sixty-month consecutive sentence applied on the § 924(c) charge, properly yielded a 300-month term of incarceration.
IV.
For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

. York, a nine-year veteran of the Statesville Police Department, is a canine officer in the *337 Department's criminal interdiction unit. Wolfe, a ten-year veteran of the Department, also works in the criminal interdiction unit.

. The district court viewed a video recording of the events as captured by York’s dashboard camera.

. The North Carolina statute proscribing motorists from following too closely mandates that a "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.” N.C. Gen.Stat. § 20-152. Notably, the statute is silent as to what constitutes a "reasonable and prudent” distance. York testified that such a distance should be measured either by the Highway Patrol's recommendation or by the "two second rule” set out in the handbook of the Division of Motor Vehicles for North Carolina drivers. The rule prescribes that a driver "should allow two seconds between the time the vehicle ahead of [the driver] passes a given point and the time [the driver's] vehicle reaches that same point.” J.A. 160. According to York, Mubdi did not comply with either standard.

. Mubdi does not press this third ground on appeal.

. Mubdi challenges both grounds on appeal. With respect to his purported privacy interest as a driver of the rental car, he argues that his case is distinguishable from United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994), in which we held that an unauthorized driver of a rental car lacks a reasonable expectation of privacy in the car, notwithstanding that he may have the authorized driver's permission. In Wellons, the evidence sought to be suppressed was the fruit of an unlawful search. Id. Mubdi contends, however, that the evidence he seeks to suppress is the fruit of an unreasonably long seizure. Mubdi presses that, to the extent that Wellons controls this case, we should revisit its holding and reach a contrary conclusion. Because we agree with the district court that the canine alert and Mubdi’s and Parham's behavior alone justified the search, we need not address this separate argument.

. Chief Judge Traxler wrote a vigorous and well-reasoned dissent in Sowards, contending that the majority incorrectly imposed an ironclad rule prohibiting in every instance a probable cause finding based solely on visual speed estimates where a vehicle is traveling only in “slight excess” of the speed limit. Sowards, 590 F.3d at 597-98 (Traxler, J., dissenting). In our view, however, the majority's opinion is not quite so inflexible, and it certainly does not purport to reject a district court's consideration of the totality of the circumstances in making its probable cause determination. Id. at 592-93. We are satisfied that the totality of the circumstances present here supports the district court’s ruling.

. The fact that an officer may err on any given speed estimate and still obtain certification, as discussed above, is not dispositive to our inquiry here. The government's probable cause burden requires no more than a reasonable ground to believe that an offense has been committed, a standard far less exacting than that imposed on the government to prove guilt beyond a reasonable doubt. Indeed, we recently emphasized that “ '[fjinelytuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in a [probable cause] decision because probable cause is only the probability, and not a prima facie showing, of criminal activity.' ” United States v. Ortiz, 669 F.3d 439, 445 (4th Cir.2012) (quoting Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

. Wolfe arrived at the scene of the stop with his drug-sniffing dog while York was issuing the warning citation, and thus the stop was not extended because of any delay in the arrival of a canine unit.