RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant*,

    *v*.

EUCLIDE AQUINO URRACA,

        *Defendant-Appellee*.

No. 24-5014

─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:22-cr-10039-1—J. Daniel Breen, District Judge.

Argued:  December 12, 2024

Decided and Filed:  December 18, 2024

Before:  SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Mary H. Morris, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant.  Lloyd R. Tatum, TATUM & TATUM, Henderson, Tennessee, for Appellee.  **ON BRIEF:**  Mary H. Morris, Adam C. Davis, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant.  Lloyd R. Tatum, TATUM & TATUM, Henderson, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge.  During the stop of a semitrailer, police learned one suspicious thing after another about the truck's cargo, its destination, and its other contents, ultimately leading to a dog sniff that alerted to drugs in the truck.  The police found 20 kilograms of cocaine

inside a wrapped box. Because the objective facts known to the officers warranted each step of the investigation, we uphold the search and reverse the district court's contrary determination.

I.

A.

On the morning of May 9, 2022, Sergeant Jeff Fuller, a 16-year veteran of the Tennessee Highway Patrol, pulled over a semitrailer for a regulatory inspection. Before stopping the truck, he noticed the driver sitting oddly with his back not touching the driver's seat and entered the truck's registration number with the Department of Transportation into a database. The inquiry showed that the trucking company had the worst possible score (99) for a company still allowed to operate. Under federal law, Fuller testified, he had the authority to stop any truck for an inspection if the company's score was 70 or above. After stopping the truck, a driver of another car told Fuller that the semitrailer had been "swerving all over" as if the trucker had been distracted by something such as a cell phone. Video at 1:32–1:50. Before approaching the driver of the truck, Fuller put on his bodycam, which recorded the relevant events.

The inspection did not go well for the truck's driver, Euclide Aquino Urraca. Over the course of an hour and a half, Fuller noticed one irregularity after another. The first irregularity started with Urraca's paperwork, which was strewn throughout the cabin. Next was his electronic logbook, which was set up incorrectly. Then came the supposed bills of lading, which were outdated. When Fuller asked for the current bill of lading, Urraca obliged but only via a screenshot on his co-driver's phone. Even this bill had unexplained and seemingly inexplicable discrepancies. Urraca had told Fuller that he was transporting air fryers, and the bill revealed deliveries in Tennessee, North Carolina, and Maryland. When Fuller inspected the trailer, which itself lacked any security seals or locks, he noticed that the cargo consisted of Craftsman tools (a "hot item" for theft), not air fryers, in boxes labeled "Philadelphia," though Pennsylvania was not a listed destination. Video at 51:10–52:25; R.80 at 39. At the end of the inspection, Fuller spoke to the cargo's purported broker, but that didn't help. The broker failed to provide basic information about the freight's origin, contents, or destination, something Fuller considered

"extremely unusual," given that the broker "facilitated" the shipment. Video at 1:15:02–1:18:07; R.80 at 41.

When Fuller sought to check the passenger compartment for required safety equipment, other oddities emerged. Looking for a fire extinguisher, Fuller asked the drivers to lift up their sleeping bunk. Urraca's co-driver appeared reluctant to do so, stalling by picking up trash from the floor—behavior Fuller found strange, as drivers usually want to get moving as quickly as possible, and this inspection had already taken over an hour. When Urraca's co-driver finally lifted the bunk, albeit only after Fuller again gestured at him to do so, Fuller saw a clean Home Depot box heavily wrapped in clear tape. He asked the drivers: "What's in the box?" Video at 1:13:35–1:13:40. The drivers' demeanor changed. Up until this point, Urraca had been chatty, even telling Fuller about his plan to buy a German Shepherd for his daughter. Now he looked away and said nothing. His co-driver did the same. After a few more seconds of silence, Fuller repeated the question: "Hey, what's in the box?" Video at 1:13:45–1:13:52. The drivers glanced at each other, spoke a few words in Spanish, and Urraca finally told Fuller: "He says it's got to be some s\*\*t of the truck owner." Video at 1:13:59–1:14:02. This surprised Fuller, who testified that, while it is not unusual for drivers to keep a box under their bunk, these boxes typically contain truck parts, "like air filters or something," and are "never" from Home Depot or "wrapped up in tape." R.80 at 48.

Last of all came the dog sniff. After completing his report, but before printing it, Fuller led his canine, Bo Dixi, around the truck. Bo Dixi had previously inspected other nearby trucks and part of Urraca's semitrailer while Urraca looked for paperwork, and she had not alerted. This time, however, Fuller took Bo Dixi all of the way around the semitrailer, and she alerted. That prompted Fuller to search the passenger compartment. A few minutes later, Fuller came across the Home Depot box, which someone had moved from under the bunk to a cabinet. Inside the box were 20 kilogram-sized bricks of cocaine. Fuller arrested the drivers.

B.

A federal grand jury indicted the drivers for possessing cocaine with the intent to distribute it. *See* 21 U.S.C. § 841(a)(1). Urraca moved to suppress the cocaine as the result of an

unlawful search.  Both parties agreed that the administrative inspection was constitutional, that the dog sniff was not part of that inspection, and that the pivotal issue was whether Fuller had reasonable suspicion to extend the stop to permit the dog sniff.

After an evidentiary hearing, the district court held that Fuller lacked reasonable suspicion to extend the stop.  It found the background facts as outlined above, and it largely credited Fuller's testimony.  But it rejected his testimony that he subjectively believed at the time of the search that the box likely contained narcotics.  In the absence of any credible evidence that Fuller subjectively believed that the box contained illegal drugs, the court determined that the dog-sniff search was unreasonable and granted Urraca's motion to suppress.  The government filed this interlocutory appeal.  *See* 18 U.S.C. § 3731.

## II.

A few ground rules and a few features of this appeal set the stage.  The government does not contest any of the district court's factual findings.  And it agrees that Fuller needed "reasonable suspicion" to extend the "otherwise-completed" inspection.  *Rodriguez v. United States*, 575 U.S. 348, 353 (2015).  Urraca does not dispute Fuller's authority to stop the truck in view of the company's poor safety score.  And Urraca does not dispute that the dog's alert justified the search of the interior of the truck.  That leaves us with the task of reviewing anew whether the facts found by the district court amount to reasonable suspicion at the time the police ordered the dog sniff.  *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996).  In doing so, we view the evidence in the light most favorable to Urraca, the prevailing party below.  *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

## III.

### A.

Reasonable suspicion sets a modest bar.  It requires a "particularized and objective basis" for suspicion.  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  That is more than just a "hunch," *Terry v. Ohio*, 392 U.S. 1, 27 (1968), but "obviously less" than probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  It is a "commonsense" standard based on "the factual

and practical considerations of everyday life." *Kansas v. Glover*, 589 U.S. 376, 380–81 (2020) (quotation omitted). To succeed, the government must demonstrate a "minimal level of objective justification" for its officers' actions, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), "based upon all the circumstances," *Cortez*, 449 U.S. at 418.

This appeal presents one question under this standard: Would a reasonable officer, apprised of all the facts, have had a legitimate reason to suspect that Urraca's truck contained drugs at the time he ordered the dog sniff?

Yes, he would. Three aspects of the inspection, taken together, lead to this conclusion.

*First* was the drivers' reaction when Fuller asked them about the bunk and the box. At the tail end of an already hour-long inspection—all legitimate and unchallenged up to then in view of the safety concerns that prompted the stop and the poor safety score of the trucking company—Fuller asked the drivers to lift up the bunk. They stalled. Urraca's co-driver started to pick up trash from the floor, and only after Fuller prompted him a second time to lift the bunk did he comply. A reasonable officer could pause over this development, as drivers "usually" want to leave "as quick[ly] as possible," and Fuller had given them a clear instruction. R.80 at 46. Their failure to promptly comply was suspicious, and reasonably prompted the inference that they had something to hide. *Cf. United States v. Vaughan*, 700 F.3d 705, 711 & n.8 (4th Cir. 2012).

Combine that with their change in demeanor when confronted with the box. Fuller asked the drivers: "What's in the box?" Video at 1:13:38. Urraca, who had been chatty up to that point, looked away and said nothing. His co-driver did the same. Ten seconds of silence passed before Fuller had to ask again: "Hey, what's in the box?" Video at 1:13:48. The drivers exchanged a few words in Spanish before Urraca finally told Fuller: "He says it's got to be some s**t of the truck owner." Video at 1:13:59–1:14:02. That the drivers' demeanor changed only when confronted with questions about the contents of the box—a box they had tried to hide— could fairly heighten a reasonable officer's suspicions. Such a "noticeable change" in behavior (especially in Urraca's case) in response to "relatively basic follow-up questions" seems "strongly indicative of criminal activity" in the context of this inspection, *United States v. Stepp*,

680 F.3d 651, 666–67 (6th Cir. 2012), in which the drivers had already shown themselves to be less than scrupulous.

*Second* was the box itself and the drivers' explanation for it. Fuller testified that he often comes across such boxes, but they typically contain "parts for the truck," "like air filters or something," "in case of a breakdown or something." R.80 at 48. Urraca's explanation for the box—that it contained "some s**t of the truck owner," so he didn't know what was inside— made little sense. Why would a truck owner keep his personal items underneath the bunk when other drivers took a cross-country trip? Urraca had told Fuller that he had been on the road for three weeks. On top of that, the box was "clean," with "no grease on it," such that it appeared to Fuller as though it "had not been in there very long at all." R.80 at 47. How, then, could this box have come with the truck? Urraca gave a hard-to-believe explanation for an already suspicious box.

*Third* is the context in which these events occurred, all after Urraca's half-truths, apparent lies, and unexplained deviations from standard industry practice. Urraca, recall, told Fuller that he was transporting air fryers, and showed him a bill of lading for deliveries to Tennessee, North Carolina, and Maryland. When Fuller looked in the trailer, however, he found Craftsman tools and boxes labeled "Philadelphia." Video at 51:10–52:25. Urraca at first denied any discrepancy, telling Fuller that Philadelphia was their "third" stop. Video at 51:30. But Fuller followed up. He looked at the bill of lading again and told Urraca that Pennsylvania wasn't listed. It was only then that Urraca conceded that he didn't know "why it says that." Video at 52:25. A reasonable officer could conclude this wasn't mere confusion; it was an attempt to fabricate details when caught in a lie.

Other aspects of the inspection bolster this inference. Unlike most drivers, Urraca's paperwork was strewn "all over the truck," with his logbook inactive and essential safety equipment missing from its usual locations. R.80 at 28, 45. Urraca initially tried to give Fuller outdated bills of lading, and only had the supposedly current bill on his co-driver's phone. When Fuller tried to verify these details, the broker could not tell him anything about the load, something Fuller found "extremely unusual" given that the broker's role is to facilitate the shipment. R.80 at 42. A reasonable officer, relying on everyday "judgments and inferences

about human behavior," *Wardlow*, 528 U.S. at 125, could doubt that Urraca was engaged in the interstate transportation of lawful goods. He could suspect, instead, that this fly-by-night operation was a front for criminal activity—perhaps criminal activity centered around the heavily-taped box that the drivers did not want to talk about.

Under all of these circumstances, a reasonable officer could fairly suspect that the box contained contraband, extend the stop for a "de minimis" amount of time in Urraca's words, Appellee's Br. 3, and order a dog sniff around the entire truck.

In challenging this conclusion, Urraca embraces the district court's factual finding that Fuller did not suspect that the box contained drugs at the time of the search. But that finding does not resolve this case. True, Fuller is an experienced law enforcement officer. True also, one might fairly expect that he acts reasonably. But the Fourth Amendment's "reasonable officer" is not a real officer with real subjective thoughts and feelings. It is a hypothetical construct of the law, one that no district court can cross-examine. That Fuller did not suspect that the box contained drugs simply does not resolve the inquiry. Just as a police officer's subjective belief that a box *does contain drugs* fails to establish the reasonableness of a search, an officer's subjective belief that a box *does not contain drugs* fails to establish the unreasonableness of a search. The reality that an officer "does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978). That explains why the Fourth Amendment does not require courts to inquire into the subjective reasons for a police officer's stop of a vehicle; it asks only whether the objective facts known to a reasonable officer would permit the stop. *See Whren v. United States*, 517 U.S. 806, 813 (1996). The facts known to Fuller at the time of the dog sniff objectively warranted the investigation, whether he subjectively appreciated all of the reasons justifying it or not.

Urraca offers other reasons to limit any suspicion arising from the drivers' change in demeanor during the stop. He notes, for instance, that the district court found that he struggled "to answer basic questions . . . throughout the entire inspection," and that his co-driver "did not speak much, if any, English." R.81 at 14. All true. But these facts do little to alter the key

point, which even Urraca seems to concede:  that he went from talkative to taciturn when confronted with the box.  Gone was the driver who mused about buying his daughter a dog, called Fuller "bro," Video at 29:51, and asked Fuller unprompted whether "y'all been having a long day," Video at 29:16.  At most Urraca's argument "slightly mitigate[s]" the weight we assign to his marked change in demeanor, R.81 at 14, but no more than that.  What was left, when viewed alongside the other facts known to Fuller, sufficed to meet the "minimal level of objective justification" that reasonable suspicion demands.  *Wardlow*, 528 U.S. at 123.

Urraca claims that we cannot rely solely on nervousness—his and his fellow driver's discomfort in response to Fuller's questions about the box—in upholding the reasonableness of a search.  But, as shown, more than mere nervousness supported Fuller's actions.  The term "nervousness" at any rate deserves elaboration and context.  At one end of the spectrum is the kind of baseline anxiety that is inevitable (and hardly suspicious) when the police stop anyone, including a judge.  *See United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004).  At the other end is the kind of change in demeanor—from candid and calm to nervy and evasive in response to a particular question or line of questions—that is more unusual and plays a legitimate role in the reasonable-suspicion assessment.  *See United States v. Shank*, 543 F.3d 309, 317 (6th Cir. 2008).  That's what we take the Supreme Court to mean when it says that courts may consider "commonsense" inferences based on "the factual and practical considerations of everyday life" in assessing the reasonableness of a search.  *Glover*, 589 U.S. at 380–81 (quotation omitted).  Urraca's nervousness fits the latter variety.

Urraca insists that we should ignore his evasions and apparent lies about his cargo and its destination because those facts suggested a theft, not the transportation of illegal narcotics.  But the Fourth Amendment "precludes this sort of divide-and-conquer analysis."  *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *see United States v. Coker*, 648 F. App'x 541, 544–45 (6th Cir. 2016).  That suspicious conduct may be "susceptible of an innocent explanation"—or suggestive of other crimes—does not preclude the police from briefly detaining a suspect "to resolve the ambiguity."  *Wardlow*, 528 U.S. at 125; *see also Sokolow*, 490 U.S. at 10.  The reality is that Urraca's apparent lies about basic aspects of his trip were fertile ground for suspicion as to all sorts of possible crimes.  When combined with the drivers' change in demeanor after being

confronted with the heavily taped box, and their reluctance to lift up the sleeping bunk in the first place, a reasonable officer could focus his suspicions on the box and on what it might contain. Whether these facts *also* might have supported an investigation into theft is irrelevant. The Fourth Amendment required only that Fuller have a reasonable basis to suspect that the drivers were concealing drugs.

B.

Because the dog sniff was permissible, so was the search. Bo Dixi's alert gave Fuller probable cause that the semitrailer contained drugs, *United States v. Whitley*, 34 F.4th 522, 535–36 (6th Cir. 2022), and thus, the automobile exception allowed him to conduct the search without a warrant, *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (per curiam). It follows that the Fourth Amendment poses no bar to admission of the cocaine as evidence.

For these reasons, we reverse.