**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4681**

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

YULIAN MANUEL VILLAVICENCIO, a/k/a Cristian Rodriguez,

       Defendant – Appellant.

**No. 18-4725**

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

ISIDORO PEREZ RIVERO, a/k/a Alexander Martinez.

       Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Dever III, District Judge. (7:17-cr-00050-D-2; 7:17-cr-00050-D-1)

Argued:  April 7, 2020                       Decided:  August 17, 2020

Before DIAZ and RICHARDSON, Circuit Judges, and Thomas E. JOHNSTON, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.

---

No. 18-4681, affirmed; No. 18-4725, dismissed by unpublished opinion. Judge Johnston wrote the majority opinion, in which Judge Richardson joined. Judge Diaz wrote a dissenting opinion.

---

**ARGUED:** Kevin Matthew Marcilliat, ROBERTS LAW GROUP, PLLC, Wilmington, North Carolina, for Appellants. Evan Rikhye, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Aaron Michel, Charlotte, North Carolina; Raymond C. Tarlton, Raleigh, North Carolina, for Appellants. Robert J. Higdon, Jr., United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, Banumathi Rangarajan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

JOHNSTON, District Judge:

This appeal arises from a traffic stop of Yulian Manuel Villavicencio ("Villavicencio") and Isidoro Perez Rivero ("Rivero"). A police officer pulled Villavicencio and Rivero over for speeding. During the traffic stop, the officer asked Villavicencio travel-related questions not pertinent to the traffic violation. After the questioning and the issuance of a warning ticket, Rivero consented to a search of the vehicle, which contained over 100 counterfeit credit cards, a fake identification card, a wireless scanning device, and a laptop computer containing identifiers for over 1,000 credit card accounts. Villavicencio and Rivero moved to suppress the evidence recovered from the search, arguing that the seizure violated the Fourth Amendment because the officer impermissibly extended the stop to investigate matters unrelated to the traffic violation. The district court denied the motion. For the following reasons, we affirm.

I.

In May 2017, a grand jury in the United States District Court for the Eastern District of North Carolina returned a four count indictment charging Villavicencio and Rivero with production, use, and trafficking of one or more counterfeit access devises and aiding and abetting of the same, in violation of 18 U.S.C. §§ 1029(a)(1) and 2, possession of 15 or more counterfeit access devises and aiding and abetting of the same, in violation of 18 U.S.C. §§ 1029(a)(3) and 2, possession of device making equipment and aiding and abetting of the same, in violation of 18 U.S.C. §§ 1029(a)(4) and 2, and aggravated identity theft and aiding and abetting of the same, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. The defendants filed separate motions to suppress the evidence seized during the traffic

3

stop that resulted in their indictments. The district court held a suppression hearing, during which Trooper Heidi Wiessman ("Wiessman") of the North Carolina State Highway Patrol's Criminal Interdiction Unit testified. Excerpts from a dashcam video of the traffic stop were also submitted into evidence. The evidence adduced at the hearing was as follows.

On February 17, 2016, Wiessman and her partner, Trooper Trey Strickland, were monitoring traffic on Interstate 95 ("I-95"), a known drug corridor, in Robeson County, North Carolina. Wiessman was observing southbound traffic from a stationary position in a marked patrol car. Her cruiser sat on the median adjacent to Strickland's patrol car, approximately six miles from the North Carolina-South Carolina border. During her surveillance, Wiessman observed a black Chevrolet Suburban SUV "traveling at a high rate of speed." (J.A. 138.) After confirming with her radar detector that the SUV was speeding, Wiessman followed the vehicle and initiated a traffic stop. Wiessman's dashcam video, which captured the stop and the time of the events, indicates that the traffic stop commenced at 10:43 a.m.

Instead of pulling over to the right shoulder, the SUV pulled over to the left side of the road on the edge of the median. Wiessman believed this to be abnormal behavior. Around 10:44 a.m., Wiessman approached the vehicle from the passenger side and made several initial observations. First, she noticed that the SUV had Florida license plates and likely was a rental vehicle because it had "a bar code on the window" and "a single key hanging from the ignition." (J.A. 142.) Wiessman also noticed four cell phones and some

4

keys in the center console area, as well as a laptop computer on the rear passenger seat. Aside from these items, there was not much else visible in the vehicle.

Wiessman then tapped on the window to announce her presence, which appeared to startle the passengers. The occupants rolled down the passenger window and Wiessman explained who she was, that she stopped the vehicle for speeding, and asked the driver, later identified as Villavicencio, for his driver's license and vehicle registration. Villavicencio apologized, admitted he was going too fast, and immediately complied by producing his Florida driver's license. The passenger, identified as Rivero, told Wiessman that Villavicencio did not speak very good English. Nonetheless, Wiessman testified that Villavicencio communicated well with her. Rivero also produced a Florida driver's license and volunteered that he and Villavicencio had traveled from Florida to North Carolina and were on their way back to Florida. Rivero gave Wiessman the rental agreement for the SUV, at which point Wiessman asked Villavicencio to exit the SUV and accompany her to her patrol car so that she could check his license and information.

When Villavicencio exited the SUV, Wiessman asked Villavicencio if he had any weapons on him, and he responded no. Villavicencio also consented to a weapons frisk, and none were found. Wiessman then instructed Villavicencio to sit in the front passenger seat of her patrol car and he complied.

At approximately 10:48 a.m., Villavicencio entered the patrol car and Wiessman began collecting Villavicencio's information and entering it into the Division of Criminal Information Network and the National Criminal Information Center. Wiessman explained that such routine checks are used to confirm that a driver's license is valid and that there

5

are no outstanding warrants. While running the checks, Wiessman continued to talk to Villavicencio about his travel itinerary. During their discussion, Wiessman learned that the men had traveled from Orlando, Florida, but Villavicencio was unable to identify the town they had visited in North Carolina. Instead, he referred her to the SUV's GPS and his hotel receipt. Villavicencio also stated that he and Rivero were in North Carolina to meet female friends. In addition, he informed Wiessman that he cleaned cars for a rental car company, which, in Wiessman's experience, indicated that Villavicencio might be "connected to some type of drug trafficking." (J.A. 234–35.)

Wiessman testified that Villavicencio's behavior suddenly changed when he sat in the patrol car. His ability to comprehend and speak English declined and his demeanor became child-like. Wiessman specifically recalled Villavicencio smiling and "recoiling" towards the door. (J.A. 155.) According to Wiessman, Villavicencio also became increasingly nervous during their interaction. She nonetheless continued to question Villavicencio about his travel plans, occasionally mixing English and Spanish terms to ensure Villavicencio adequately understood what was asked of him and, more importantly, to ensure that she understood him. Wiessman testified that she became suspicious of Villavicencio's inability to understand English because "[h]e was intentionally trying to demonstrate to [her] that he didn't understand." (J.A. 157.) Wiessman explained that he would respond, "'What, what?' And then lean[] back and giv[e] [her an uncanny] smile." (*Id.*)

The minute mark on the dashcam video reflects that the databases returned clean results, confirming Villavicencio's driver's license and the lack of any warrants,

6

approximately five minutes after he sat in Wiessman's patrol car. Wiessman then began reviewing the car rental agreement. Upon reviewing the agreement, Wiessman noticed that the agreement listed the renter's name as "Isidoro Perez," rather than "Isidoro Rivero." (J.A. 162.) Wiessman also noticed that they had rented the SUV on February 15, 2016, at 11:34 p.m., from the Orlando International Airport, and that it was required to be returned on February 18, 2016, at 9:00 a.m. Considering the travel time from the location of the traffic stop in North Carolina to the Orlando airport was approximately 24-26 hours roundtrip, Wiessman discerned that Villavicencio and Rivero had been in North Carolina for less than 24 hours. In addition, the rental cost of the SUV was $630.47, which Wiessman thought was "rather expensive for a one-day trip." (J.A. 162.) Because Villavicencio had not articulated specific travel plans and could not identify the town he and Rivero had visited, Wiessman thought that their travel was out of the ordinary.

Wiessman testified that, at this point, she developed reasonable suspicion that Villavicencio and Rivero were engaged in criminal activity. According to Wiessman, it was not just one thing that made her suspicious:

> It's a combination of many things: The anomalies that were present, the facts that I had that presented themselves to me was—everything from the way the stop occurred to how they pulled over to [how] they understood English enough to follow my directions, how they got out of the vehicle and . . . [were] able to follow my simple commands at that time—and I spoke plain, simple English—to the fact that the minute [Villavicencio] got in my vehicle, I noticed that his communication dissipated. It deteriorated. It was just degrading itself, but it was . . . intentional. And I notice that his mannerisms, the way that he was acting, the way that he was overly smiling, he was like just becoming very shifty in his seat. He was moving around. He was looking at my camera, staring at the camera. Then he'd look back at me and lean at the window. All these things, the totality of the circumstances, not

7

just one specific thing. But again, in my training and experience, I'm trained to look at all of these things.

(J.A. 167.) Wiessman also explained that she considered everything she observed, including the four cell phones in Villavicencio and Rivero's possession, the lack of visible luggage or "travel comforts" in the vehicle, (J.A. 168), Villavicencio's reluctance to confirm or explain where they were going, who they were with, or where they were staying, and that Dunn, North Carolina, is not a tourist destination.

Around 11:01 a.m., Wiessman issued a warning ticket to Villavicencio and informed him that he was not an authorized driver on the rental agreement. She also stated that she planned to speak to Rivero to let him know that Villavicencio could no longer drive the SUV and instructed Villavicencio to remain in her patrol car while she spoke to Rivero. Sometime before issuing the warning ticket, Wiessman called Trooper Strickland for back-up and decided she would seek consent to search the SUV.

As Wiessman approached the rental car, she noticed that Rivero was talking on a cell phone and then "hung up real quick."[1] (J.A. 173.) Wiessman asked Rivero to step out of the car so that she could speak to him. Rivero understood her request and complied. Once he exited the car, Wiessman noticed that Rivero's breathing became heavy and his English started to decline. Wiessman asked Rivero about the discrepancy between the rental agreement and his driver's license, and Rivero confirmed that his full name was

---

[1] Notably, the dashcam recorded Villavicencio making a phone call at that time. During the call, Villavicencio can be heard telling a male that "she's going to ask you about the car. We had it for 10 hours and I came to see a [female] friend." The other male voice questions, "[a] [female] friend?", and Villavicencio responds, "[m]m-hm. Bye." (J.A. 122.)

8

"Isidoro Perez Rivero." (J.A. 175.) Wiessman also asked Rivero how long he had known Villavicencio and where Villavicencio lived to which Rivero responded that Villavicencio and he were childhood friends. He could not, however, tell her where Villavicencio lived. When Wiessman asked why the two men had traveled to North Carolina, Rivero simply shrugged his shoulders and said, "just to look around." (J.A. 176.) When Wiessman inquired where the men stayed in North Carolina, Rivero produced a hotel receipt for the Hampton Inn in Dunn, North Carolina, which showed that the men checked into the hotel on February 16, the night before the stop, at 11:35 p.m. Wiessman returned the rental agreement and driver's license to Rivero and inquired if she could speak to him further to which he agreed. Wiessman, ultimately, asked Rivero for consent to search the SUV. Rivero verbally consented and signed a consent to search form.

Upon his arrival, Trooper Strickland conducted a canine search of the vehicle. The canine did not alert to the presence of narcotics. Wiessman then conducted a search of the SUV's interior, during which time she noticed something was amiss with the skirting on the front passenger seat. She reached down to further inspect the area that appeared to have been manipulated, noticed it was loose and, with little effort, the skirt fell. Concealed inside was a baggie with 100 credit cards, a skimming device, a master key for gas pumps, and a fake identification card for Rivero, bearing Rivero's picture but in the name of "Alexander Martinez[.]" (J.A. 182.) The credit cards were also in the name of "Alexander Martinez" as well as "Christian Rodriguez." (J.A. 182-83.)

Wiessman returned to her patrol car to retrieve her phone, which she found under the front passenger seat. Next to her phone, she discovered a driver's license depicting

9

Villavicencio and bearing the name "Christian Rodriguez." (J.A. 183.) Law enforcement later searched the laptop from the SUV and discovered about 1,300 credit card numbers on the computer.

After hearing the evidence and oral argument, the district court announced its findings of fact and conclusions of law on the record and denied the defendants' motions to suppress. The district court determined:

> First, Trooper Wiessman had an objective right to conduct the traffic stop because the Suburban was exceeding the posted speed limit; second, Trooper Wiessman proceeded to complete the tasks related to the traffic infraction in a reasonable and diligent manner under the totality of the circumstances while simultaneously making unrelated but permissible inquiries; third, during this process, Trooper Wiessman learned facts upon which she developed a reasonable suspicion of criminal activity; fourth, Trooper Wiessman lawfully continued the stop in order to investigate her suspicions, including speaking with Rivero; and fifth, when Trooper Wiessman's reasonable suspicions did not dissipate but actually increased, she requested and obtained consent to search the vehicle after which the stop was continued to its completion.

(J.A. 285.) In reaching these conclusions, the district court expressly credited Wiessman's testimony and noted her extensive history in law enforcement, including patrolling I-95, a known drug corridor. The court also noted that it had reviewed the dashcam footage from Wiessman's patrol car and the time markings indicated on the video. Following the suppression hearing, the district court entered a one-page order denying the motions for the reasons explained at the hearing.

Subsequently, Villavicencio and Rivero entered conditional guilty pleas, pursuant to separate plea agreements, to counts one and four of the indictment for producing, using, and trafficking one or more counterfeit access devices, and aggravated identity theft. Both

10

plea agreements reserved the defendants' right to appeal the district court's order denying their motions to suppress the evidence seized by law enforcement during the traffic stop. The district court accepted the pleas and, ultimately, sentenced each defendant to 72 months' imprisonment. The defendants timely appealed.

II.

Given the factual and legal issues are identical, the Court consolidated Villavicencio and Rivero's appeals.[2] On appeal, Villavicencio asserts that the district court erred in denying his motion to suppress because Wiessman unlawfully detained him beyond the scope and duration necessary to complete the purpose of the stop in violation of the Fourteenth Amendment. According to Villavicencio, at the time he was issued a warning ticket for the speeding violation and the mission of the stop was otherwise completed, Wiessman lacked reasonable suspicion to prolong the stop and investigate matters unrelated to the traffic infraction. Based on the belief that Wiessman lacked reasonable

---

[2] The Government filed a motion to dismiss Rivero's appeal on the grounds that he is a fugitive who has failed to surrender to the authorities. Although Rivero's counsel was present for oral argument, we hold that Rivero's abscondence warrants a dismissal of his appeal and, accordingly, we grant the Government's motion. *See Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 595 (4th Cir. 2002) (explaining, under the fugitive disentitlement doctrine, "a court may 'dismiss an appeal . . . if the party seeking relief is a fugitive while the matter is pending.'" (citing *Degen v. United States*, 517 U.S. 820, 824, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996))). Nonetheless, given Rivero's appeal is consolidated with Villavicencio's, the Court's ruling herein would apply equally to him.

suspicion to extend the stop, Villavicencio argues that Rivero's subsequent consent to the search of the vehicle was invalid.[3]

In reviewing a district court's denial of a suppression motion, the Court reviews factual findings for clear error and legal conclusions de novo.  *See United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019) *cert. denied*, 140 S. Ct. 976 (2020) (internal quotation marks omitted).  In so doing, the Court applies "a de novo standard of review to a district court's determination that an officer had reasonable suspicion to prolong a traffic stop."  *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).  The Court construes the evidence in the light most favorable to the prevailing party, *see United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016), and gives "due weight to inferences drawn from those facts by resident judges and law enforcement officers." *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010) (internal quotation marks and citation omitted).  Nonetheless, we are "not limited to the district court's reasoning," and may "affirm on any ground supported

---

[3] At oral argument, Villavicencio's counsel raised a new issue, namely, whether Wiessman's line of questioning unrelated to the speeding violation unduly prolonged the stop prior to the issuance of the warning ticket.  Because this issue was not raised in Villavicencio's opening brief, we will not address this argument on appeal and hold that this claim is waived.  S*ee, e.g., Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 153 n.4, 6 (4th Cir. 2012) (holding claims not addressed in brief on appeal are waived); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (holding argument not raised in opening brief but raised for the first time in reply brief was waived); *United States v. Williams*, 378 F.2d 665, 666 (4th Cir. 1967) (per curiam) (holding issues argued orally but not addressed in brief were waived); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (stating arguments that failed to comply with Federal Rule of Appellate Procedure 28(a)(9)(A) are waived).

by the record." *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (internal quotation marks omitted).

III.

It is well-established that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996); *see also* U.S. Const. amend. IV (protecting "against unreasonable searches and seizures . . . ."). A traffic stop, therefore, must satisfy the Fourth Amendment's reasonableness limitation. *Whren*, 517 U.S. at 810; *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (stating that the guarantees under the Fourth Amendment extend to "brief investigatory stops of persons or vehicles"). In that regard, "[b]ecause a traffic stop is more akin to an investigative detention than a custodial arrest," we apply the two-prong standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) in determining whether a stop is reasonable. *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015).

Pursuant to *Terry*, a traffic stop comports with the reasonableness standard of the Fourth Amendment where (1) the "stop [i]s legitimate at its inception" and (2) "the officer's actions during the seizure [are] reasonably related in scope to the basis for the traffic stop." *Bowman*, 884 F.3d at 209 (internal quotation marks and citations omitted). An initial traffic stop is warranted where an officer has "probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Nonetheless, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution

13

unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). For instance, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

The acceptable duration of a traffic stop "is determined by the seizure's mission— to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492 (2015) (internal quotation marks and citation omitted). Ordinary tasks related to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 349. An officer can also ask about a rental car agreement, as Villavicencio's counsel conceded at oral argument. These types of "checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* In addition, an officer may permissibly ask questions of the vehicle's occupants that are unrelated to the violation, provided that doing so does not prolong the stop absent independent reasonable suspicion. *Id.* at 355. In assessing the reasonableness of a stop, we consider "what the police in fact do." *Id.* at 357. Thus, the "critical question" is not whether the unrelated investigation "occurs before or after the officer issues a ticket," but whether conducting the unrelated investigation "prolongs—i.e., adds time to—the stop." *Id.* (internal quotation marks omitted). A traffic stop becomes unlawful "when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Id.* at 354.

14

Villavicencio suggests in his opening brief that the original traffic stop was pretextually based on a speeding violation, *see* Appellant's Br. at 25, 27, but later concedes that the traffic stop was lawful, *see* Appellant's Br. at 30. To the extent Villavicencio argues that the initial stop was unlawful, this argument was not raised in his motion to suppress before the district court and, thus, cannot be argued now on appeal. *See United States v. Benton*, 523 F.3d 424, 428 (4th Cir. 2008) ("Failure to raise an argument before the district court typically results in the waiver of that argument on appeal."). Despite this assertion, we find that Wiessman had probable cause to initiate the stop based on her observation of Villavicencio's vehicle exceeding the speed limit. Having lawfully stopped the SUV for speeding, Wiessman temporarily detained Villavicencio to perform those tasks associated with a routine traffic stop. The district court concluded from Wiessman's testimony and the dashcam video that the stop occurred around 10:43 a.m. Wiessman approached the car around 10:44 a.m. and spoke with the occupants for roughly three minutes. During this time, she explained to Villavicencio that she stopped him for speeding and asked for his driver's license and car registration. He complied and produced his Florida driver's license.

At this time, Rivero also volunteered his Florida driver's license, explained that the car was a rental, and gave her a copy of the rental agreement. Wiessman did not scrutinize the rental agreement at this moment. Instead, she asked Villavicencio to exit the vehicle and accompany her to her cruiser to verify his information. Before they got into her patrol car, Wiessman lawfully and consensually frisked Villavicencio for officer safety. *See Rodriguez*, 575 U.S. at 356 (explaining that "officer safety interest stems from the mission

15

of the stop itself"); *United States v. Hampton*, 628 F.3d 654, 658 (4th Cir. 2010) (an officer may order passengers to get out of a vehicle pending completion of a traffic stop "as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk.") (citing *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)).

Once seated in the cruiser, around 10:48 a.m., Wiessman began verifying Villavicencio's license and checking for outstanding warrants by entering his information into a local and national database. Wiessman testified that these checks inherently take a few minutes to complete. In this instance, the checks returned clean results for Villavicencio in approximately four minutes. While these checks were running, Wiessman spoke with Villavicencio about his travel itinerary. Wiessman was free to talk to Villavicencio at least until the moment that all the database checks had been completed. *See Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 783, 172 L. Ed. 2d 694 (2009) ("[a]n officer's inquiries into matters unrelated to the" traffic violation "do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). During their exchange, Villavicencio was visibly nervous. Wiessman learned that he and Rivero drove from Florida to North Carolina to visit girls. Villavicencio could not identify the town they had visited and became increasingly nervous during their conversation.

Once the database checks were complete, Wiessman began to inspect the rental agreement. She noted that the name on the agreement did not match Rivero's. She also observed that the SUV was rented on February 15, 2016, at 11:34 p.m. and had to be returned on February 18, 2016, by 9:00 a.m. Given the distance and travel time, Wiessman

16

determined that Villavicencio and Rivero spent approximately 24 hours in North Carolina before returning to Florida. Around 11:01 a.m., Wiessman completed all necessary tasks incident to the stop and issued Villavicencio a warning ticket. The question, thus, becomes whether the information known to Wiessman at the time she issued Villavicencio a warning ticket yielded reasonable suspicion of criminal activity to extend the stop.

The reasonable suspicion standard requires "'considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014)). In order to meet this standard, an "officer's suspicions must . . . be more than an 'inchoate and unparticularized suspicion or hunch'" of criminal activity. *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (citing *Terry*, 392 U.S. at 27). Rather, "a police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." *Bowman*, 884 F.3d at 213 (quoting *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008)). We "'cannot reasonably demand scientific certainty . . . where none exists,'" and "must permit officers to make 'commonsense judgments and inferences about human behavior.'" *Glover*, 140 S. Ct. at 1188 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

When reviewing whether an officer developed reasonable suspicion, we look at the totality of the circumstances. *Arvizu*, 534 U.S. at 274. The possibility that some facts on their own might be innocently explained does not suffice to defeat a finding of reasonable

17

suspicion if "the articulated factors . . . 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Palmer*, 820 F.3d at 650 (quoting *Williams*, 808 F.3d at 246); *see also Navarette*, 572 U.S. at 403 (noting that an officer "'need not rule out the possibility of innocent conduct'").

In this case, the district court credited the testimony of Wiessman, who had over 25 years of law enforcement training and experience, and concluded that Wiessman confronted several facts before Villavicencio was issued a warning ticket that in the totality of the circumstances support a basis for reasonable suspicion of criminal activity. Those factors include the following: (1) the defendants were traveling through a known drug corridor; (2) they traveled a long distance and stopped for approximately 24 hours before returning to Orlando, Florida; (3) Villavicencio oddly pulled over to the left shoulder as opposed to the right as most drivers do; (4) the defendants were in a rental car with four cell phones and a laptop computer but no visible luggage; (5) the name on the car's rental agreement did not match the name on Rivero's driver's license; (6) the cost of the rental car was $630.47, which Wiessman thought was excessive; (7) the defendants drove to a remote, non-tourist destination purportedly to visit one or more female friends; (8) Villavicencio could not identify the town he and Rivero had stayed in the night before; and (9) he exhibited strange behavior and became increasingly nervous during his interaction with Wiessman. (J.A. 279–80.) We evaluate these facts both separately and in the aggregate.

First, Wiessman testified that, based on her knowledge and experience, I-95 had become a frequent corridor for drugs moving both north and south, primarily between

Florida and New York, thus "linking travel on an interstate highway with drug trafficking." *Williams*, 808 F.3d at 248. *See United States v. Newland*, 246 F. App'x 180, 188 (4th Cir. 2007) (taking judicial notice of the fact that I-95 is "a major thoroughfare for narcotics trafficking"). Villavicencio's travel on a major drug trafficking freeway is not highly probative in and of itself considering the number of innocent motorists that use interstate highways for convenient travel. *See Williams*, 808 F.3d at 248 (giving little weight to fact that defendants were traveling on a known drug corridor). However, when coupled with the fact that he and Rivero rented the vehicle in a source state for narcotics, Villavicencio's travel on I-95 is a valid contribution to the reasonable suspicion analysis. We have "little doubt" that "the car rental, the traveling on I-95, and the traveling from Florida factors … enter the reasonable suspicion calculus." *United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez*, 575 U.S. at 355-57. *See United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000) (en banc) (citing travel along I-95 and departure from a source city as factors contributing to reasonable suspicion); *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (characteristics of location in which the officer encounters vehicle is a significant factor in formulating reasonable suspicion) (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

The next factor focused on Villavicencio's sudden decision to pull over to the left shoulder as opposed to the right side of the road. This behavior, while uncommon and generally unsafe, is not a significant indicator of criminal activity. Particularly since

19

Villavicencio had been traveling in the left-hand lane at the time Wiessman signaled for him to pull over, we find his behavior to be innocuous.

With respect to the visible contents of the vehicle, or lack thereof, the absence of luggage or provisions is not compelling under the reasonable suspicion analysis. *See Bowman*, 884 F.3d at 216 (rejecting the contention that the presence of luggage and food suggests a longer period of travel than the defendant admitted to). Undoubtedly, many innocent travelers driving a large SUV, such as a Chevrolet Suburban as in this case, store luggage or other travel necessities in the trunk as opposed to on the rear passenger seat. Here, there is no evidence that Wiessman was in a position to observe the back cargo area prior to her issuance of the warning ticket.

However, Wiessman also relied on the presence of four cell phones in the center console of the vehicle with only two passengers. She testified that, in her experience, the presence of multiple cell phones often indicates involvement in illegal business or activity. *See* J.A. 168-69 ("A lot of times defendants will have multiple cell phones because they will use one cell phone for their family, for their friends, and the other cell phone is known as a business phone or a burner phone . . . [used] only for illegal or business transactions."). While multiple cell phones are not suspicious standing alone, they do contribute under the totality of the circumstances to reasonably arouse suspicion. *See United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir. 2012) (finding presence of four cell phones in vehicle relevant to the reasonable suspicion analysis, in part, because the detained vehicle contained only

two occupants); *Newland*, 246 F. App'x at 189 (finding the presence of multiple cell phones contributed to reasonable suspicion as part of the totality of the circumstances).[4]

Next, the minor inconsistencies between the name on the rental agreement and Rivero's driver's license is of minimal value. Wiessman explained that Hispanic names are often transposed incorrectly onto driver's licenses, rental agreements, and other documents.

In continuing to identify the factors that contributed to her reasonable suspicion, Wiessman pointed out that the cost of the rental was $630.47, which, based on her experience, was "extremely expensive . . . particularly a lot of money for somebody who's just traveling one day up, staying in a hotel that they're not familiar with." J.A. 164. This sort of travel "was abnormal." *Id*. Thus, Wiessman "certainly was entitled to rely, to some degree, on [the travel's] unusual nature in determining whether criminal activity was afoot." *Digiovanni*, 650 F.3d at 513.

---

[4] The dissent seeks to distinguish *Vaughan* on the ground that its holding "was expressly limited to the peculiar situation in which an officer observes multiple cellphones, *only some of which are prepaid*." Dissent at 6. But we have not foreclosed the possibility that the presence of "multiple cell phones", standing alone, can "'further[]'" an officer's reasonable suspicion. *United States v. Jordan*, 952 F.3d 160, 165 (4th Cir. 2020). Recently, in *Jordan*, we refused to reach that issue since we found that the officer "had the requisite reasonable suspicion that [the defendant] was engaged in illegal drug activity" before the officer saw "several other cellphones in the vehicle." *Id.* at 164, 167.

In addition, our sister circuits have found that multiple cellphones inside a vehicle can factor into the officer's reasonable suspicion calculus. *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 59 (2d Cir. 2018) (holding that the presence of more than one cell phone "heightened rather than dispelled" the officer's reasonable suspicion); *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009) (listing "multiple cell phones in the truck" as a "suspicious circumstance[]").

21

Moreover, Wiessman testified that Villavicencio's increasing nervousness and evasive behavior were indicators of criminal activity. Specifically, Wiessman noted that, in the beginning of the traffic stop, Villavicencio "understood [her] directions." J.A. 177. However, once inside the patrol car, Villavicencio "tried or implied that he was starting to have less [of an] understanding" of English. J.A. 156. Even though Wiessman communicated with Villavicencio using a mixture of Spanish and English, she started to "grow suspicious" of his language evasiveness. J.A. 157. Wiessman believed that Villavicencio "was intentionally trying to demonstrate to [her] that he didn't understand." *Id.*; see also J.A. 299 (district court finding that, "[g]iven the totality of the[ circumstances] and both verbal and nonverbal interaction, . . . Villavicencio and Rivero possessed sufficient understanding of English to enable Trooper Wiessman to engage with them appropriately and meaningful[ly]").

Along with this evasiveness, there is no question that Wiessman was also entitled to rely on Villavicencio's nervousness to some degree. *See Wardlow*, 528 U.S. at 124 (stating, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Although Villavicencio's apparent nervousness, standing alone, is of little value in the reasonable suspicion analysis, Wiessman indicated that Villavicencio's nervousness did not subside as would be expected of other individuals who were only issued a warning. Indeed, the district court so found. *See* J.A. 294 ("[A]fter Trooper Wiessman issued a ticket and told Villavicencio it was only a warning, Villavicencio's nervousness did not subside as would be expected among typical innocent travelers."); *see also United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (finding it relevant to the

22

reasonable suspicion analysis that the defendant "was sweating and unusually nervous when interacting with [law enforcement]," and that the other defendant's "nervousness did not subside, as occurs normally, but became more pronounced as the stop continued"); *Foreman*, 369 F.3d at 785 (exceptional nervousness that grew worse when officer raised the issue of drug trafficking added to reasonable suspicion determination).

Villavicencio's demeanor was unlike that of the defendant in *Bowman*, 884 F.3d 200. There, we were also confronted with the question of whether an officer had reasonable suspicion of ongoing criminal activity to justify extending a traffic stop. Among the factors that contributed to the officer's articulated reasonable suspicion was Bowman's "nervousness during the traffic stop." *Id.* at 208. Granted, "'a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police.'" *Id.* at 214 (citing *Palmer*, 820 F.3d at 652-53 n.7). But what is relevant to the determination of reasonable suspicion is whether the driver exhibits "nervous, *evasive* behavior." *Id.* (citing *Wardlow*, 528 U.S. at 214) (emphasis added). That is what Wiessman observed. While in the patrol car, she noticed that Villavicencio "went from being very engaged and very listening to kind of almost like recoiling and pulling himself away." J.A. 155. And when Wiessman gave Villavicencio the warning ticket, she observed that his nervousness did not subside, "as occurs normally." *Mason*, 628 F.3d at 129. Wiessman's observations of Villavicencio's nervousness in comparison to the behavior of other drivers she has stopped in the past should not be discounted. *See Lender*,

23

985 F.2d at 154 ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.").[5]

Wiessman also considered Villavicencio's inability to identify the town he and Rivero had stayed in the night before as a heightening factor to reasonable suspicion. Wiessman inferred that either Villavicencio did not know where in North Carolina he had been or that he did not want her to know. The fact that Villavicencio could only tell Wiessman that the name of the town was on the GPS and the hotel receipt, *see* J.A. 278, by itself, was not suspicious. "[I]t would be perfectly consistent with innocent travel for a person to rely on a GPS system to navigate and still not know precisely where he had been." *Bowman*, 884 F.3d at 217.

Along with his supposed lack of knowledge, Villavicencio's itinerary did not suggest innocent travel, as Wiessman reasonably concluded. Indeed, "common sense suffices to justify this inference" that most innocent travelers would not spend $630 to rent

---

[5]As we noted above, the district court also made certain findings about Villavicencio's nervousness and language evasiveness. *See* J.A. 294, 298-99. We review these "factual findings for clear error." *Drummond*¸ 925 F.3d at 687 (internal quotation marks and citation omitted). Under this standard, we "must ask whether, *on the entire evidence*, … [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012) (internal quotation marks and citation omitted) (emphasis added). We cannot evaluate the district court's finding on Villavicencio's nervousness by *solely* consulting Wiessman's dashcam video, which covered only the time when Wiessman and Villavicencio were in the patrol car and did not reveal the defendant's actions, only his words. Likewise, we cannot evaluate the district court's finding on Villavicencio's language evasiveness by relying on the dashcam video. We must consider the "entire evidence," *id.*, including the initial discussion between Wiessman and Villavicencio at the beginning of the stop, which also was not captured on video.

a vehicle in Orlando, Florida, proceed to drive most of the night and into the next morning to a sparsely populated area in North Carolina, which they had no familiarity with, to visit girls for approximately 24 hours before driving back to Florida. *Glover*, 140 S. Ct. at 1188. Of course, it is conceivable, given social media today, that Villavicencio met females online and traveled this long distance—which Wiessman estimated would take 24 to 26 hours roundtrip—to briefly visit them. However, the reasonable suspicion standard does not ask what is plausible. *See Navarette*, 572 U.S. at 403. Instead, reasonable suspicion is based on "commonsense judgments and inferences about human behavior." *Glover*, 140 S. Ct. at 1188 (quoting *Wardlow*, 528 U.S. at 119). As the Supreme Court explained in *United States v. Sokolow*, "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same – and so are law enforcement officers." 490 U.S. 1, 8 (1989). In *Sokolow*, the Supreme Court found "probative significance" in the fact that Sokolow traveled from Honolulu, Hawaii "for 20 hours to spend 48 hours in Miami during the month of July." *Id.* at 9. This out-of-the-ordinary travel helped establish the reasonable suspicion that Sokolow was transporting illegal drugs. Likewise here.

Under the totality of the circumstances, we conclude that Wiessman had reasonable suspicion that there were "drugs in this vehicle, possibly concealed," J.A. 166, at the time she issued Villavicencio the warning ticket, thereby justifying Villavicencio's further detention and a lengthier stop.

Notwithstanding the undisputed evidence, Villavicencio asserts that the Supreme Court's decision in *Rodriguez* and this Court's *Bowman* decision dictate a different

conclusion. In *Rodriguez*, the Supreme Court addressed whether a dog sniff is constitutional if it extends an otherwise completed traffic stop, even if for a few minutes. 575 U.S. at 353. There, the officer lawfully stopped a vehicle, with two occupants, for driving on the shoulder. *Id.* at 351. The officer ran a records check on the driver, issued a warning ticket, and returned his documents. Put simply, the officer had "[taken] care of all the business" related to the traffic violation yet did not consider the defendant "free to leave." *Id.* at 352. The officer held the defendant for an additional seven or eight minutes until a canine unit arrived, and a search ultimately uncovered methamphetamine in the vehicle. *Id.* On defendant's motion to suppress, the Court concluded that, "absent reasonable suspicion," an officer may not prolong a traffic stop to allow a canine sniff. *Id.* at 353. The Court, however, declined to address the primary question at issue here, "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation," instead leaving that issue open for consideration on remand. *Id.* at 358.

Villavicencio's position overextends *Rodriguez*. Here, there is ample evidence of reasonable suspicion of criminal activity independent of the initial traffic violation. More importantly, Wiessman's reasonable suspicion developed while she was completing the traffic stop mission related activities and before issuing the warning ticket to Villavicencio. *Rodriguez* anticipated that such a scenario could be possible but declined to the consider whether the particular facts presented in that case sufficiently established reasonable suspicion. Thus, because Wiessman had reasonable suspicion of criminal activity, her extension of the stop did not violate the narrow rule found in *Rodriguez*.

26

Villavicencio's heavy reliance on *Bowman* is also unpersuasive in light of its factual distinctions and collective effect on reasonable suspicion. In *Bowman*, after observing a vehicle speeding and weaving across the lane, an officer initiated a traffic stop of the defendant's red 1998 Lexus, believing that the driver may have been under the influence of drugs or alcohol. 884 F.3d at 205. At the time, the officer also possessed information from the Drug Enforcement Agency that two individuals suspected of drug trafficking activity may be in the area and possibly driving "a red, older model Lexus." *Id.* After completing the tasks related to the stop, the officer issued the driver, Bowman, a warning ticket and further detained him to conduct a search of the vehicle. *Id.* at 207. Notwithstanding the lack of consent, the officer called for a canine officer, which alerted to the presence of narcotics in Bowman's vehicle. *Id.*

During the suppression hearing in *Bowman*, the Government attempted to justify the extension of the traffic stop based upon the officer's observations that the driver appeared to be nervous; the passenger did not make eye contact with him and also appeared nervous; a suitcase, an energy drink, food wrappers, and loose items of clothing were present in the vehicle; and the driver's statement that he was recently laid off but, despite his unemployment, had recently purchased the Lexis and another vehicle off Craigslist. *Id.* at 206. Although the district court denied the motion to suppress, this Court reversed and found that the factors relied on by the officer did not give rise to reasonable suspicion of criminal activity to extend the traffic stop. *Id.* at 219. In reaching this conclusion, we evaluated each factor identified by the officer, first separately and then collectively, and explained that "[a]lthough the nature of the totality-of-the-circumstances test makes it

27

possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id.* (internal quotation marks omitted). In conclusion, this Court held that the Government failed to satisfy its burden of establishing what significance the outwardly innocent factors upon which it relied played in the illicit drug trade. *Id.* at 218–19.

Unlike *Bowman*, this is not a case where an officer prolonged the stop based on a vague tip and a few "wholly innocent" observations. *Id.* at 219 (internal citations omitted). Although Wiessman articulated several facts that standing alone are consistent with innocent travel, many of the facts on which she relied, when taken as a whole, supported her reasonable suspicion. *See Branch*, 537 F.3d at 337 ("Courts must look at the cumulative information available to the officer," rather than "find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference").[6]

Because Wiessman possessed reasonable suspicion that criminal activity was afoot, she was constitutionally entitled to direct Villavicencio to remain in her cruiser and to

---

[6] Villavicencio's case is more in line with the facts of *Mason*, 628 F.3d at 125. There, we were again asked to determine whether a state trooper developed reasonable suspicion of criminal activity to extend a traffic stop. *Id.* We held that the trooper had. In sum, there were five facts that, "when taken as a whole, supported his suspicion, even though several of the facts, when taken alone, were also consistent with innocent travel." *Id.* at 128. For instance, "the two men were coming from the direction of Atlanta, a city that, according to [the trooper], was ranked third in the nation in terms of drug distribution, on a known drug route," and "Mason was sweating and unusually nervous when interacting with him, and Mason's nervousness did not subside." *Id.* at 129. So too here. Taking the articulated facts together as a whole, we find that "sufficient facts existed to have given an experienced officer a reasonable suspicion that criminal activity was afoot." *Id.*

28

question Rivero.  Villavicencio does not dispute that Rivero's subsequent consent to a search of the vehicle was voluntary.  Indeed, Rivero verbally agreed to the search in addition to signing a written consent form.  The consensual search of the vehicle therefore complied with the Fourth Amendment.  *See Brugal*, 209 F.3d at 362 (it is axiomatic that "[a] defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant").

IV.

For the foregoing reasons, we affirm the district court's denial of Villavicencio's motion to suppress.

No. 18-4691, *AFFIRMED;*
No. 18-4725, *DISMISSED*

29

DIAZ, Circuit Judge, dissenting:

Yulian Manuel Villavicencio and Isidoro Perez Rivero were pulled over for speeding on I–95 around 10:44 in the morning by Trooper Heidi Wiessman. The two longtime friends claimed that they were traveling back to Florida, where they lived, after spending the night with female friends at a hotel in North Carolina. The resulting traffic stop would last over an hour and involve two frisks, a call for a K-9 unit, and, finally, a search of the vehicle. Eventually, after removing the skirting of the vehicle, Wiessman discovered counterfeit credit and identification cards. Following conditional guilty pleas, both men were sentenced to 72 months' imprisonment for distribution of counterfeit items and aggravated identity theft. Because I am convinced that the seizure in this case ran afoul of the Fourth Amendment, I respectfully dissent.

I.

I begin with the points on which the majority and I agree. Like the majority, I find that the traffic stop was lawful when it began and that all ordinary tasks incident to the stop were completed at the time Wiessman issued Villavicencio a warning ticket. Thus, we agree that Wiessman needed reasonable suspicion to extend the stop beyond that point. And, we also agree that several facts the district court relied on in finding the requisite suspicion are, in fact, innocuous. These include (1) that the vehicle, which was traveling in the left lane, pulled over to the left shoulder of the road; (2) that Wiessman, who was standing at the front righthand side of the large SUV, didn't immediately observe luggage

30

in the vehicle; and (3) that it's (at best) "of minimal value" that the rental car agreement contained minor inconsistencies related to Rivero's driver's license. Maj. Op. 21.

But I emphatically part company with the majority's effort to cobble together Wiessman's remaining observations to find reasonable suspicion to prolong the stop. In the traffic stop context, reasonable suspicion requires that the "relevant facts articulated by the officers and found by the trial court . . . in their totality serve to eliminate a substantial portion of innocent travelers." *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (cleaned up). My friends in the majority find this requirement satisfied based on the following facts: (1) the car was rented in Florida and the defendants were traveling on I–95, (2) there were four cellphones in the center console, (3) Villavicencio was nervous and evasive, and (4) Villavicencio either could not or would not provide details of his travel itinerary.[1] According to the majority, these facts suggest an "unusual" travel itinerary, Maj. Op. 21, and, in their totality, constitute "ample evidence" of criminal activity, Maj. Op. 26. I cannot agree.

Like the majority, I begin by addressing the facts supporting suspicion individually before considering them in the aggregate.

---

[1] The majority too notes that the two men drove a "long distance . . . to a remote, non-tourist destination." Maj. Op. 18. In fact, Wiessman was unaware of where the two men were headed until *after* she prolonged the stop. Villavicencio's inability to recall the name of the town the men visited was, after all, one of the factors that Wiessman found suspicious. The majority also points to Wiessman's observation that the rental car was expensive, but (like Wiessman) fails to provide any link between an expensive rental and criminal activity.

31

A.

The majority first highlights that Wiessman's suspicions were raised by the car's presence on I–95, which she characterized as a "known . . . drug corridor." J.A. 137. But as the majority also concedes, innocent motorists, too, use I–95. That interstate is, after all, a major thoroughfare spanning the eastern seaboard. Indeed, we've previously observed that "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads." *Williams*, 808 F.3d at 247. Thus, "[b]ecause there is nothing inherently suspicious about driving . . . on an interstate highway," we require officers to "link interstate-highway travel to more specific characteristics of narcotics trafficking." *Id.* at 248.

Here, the majority finds that link in the fact that the car was rented in Florida, which Wiessman characterized as a source state for narcotics. My friends read far too much into this observation. Granted, travel from a "source city" is often cited by law enforcement officers as raising suspicion. *See United States v. Wilson*, 953 F.2d 116, 124–25 (4th Cir. 1991). But we've previously cautioned that travel from a major "source city" is a "relevantly insignificant" factor in this analysis because of "the vast number of persons" traveling from those cities. *Id.* at 125. Such caution is especially warranted here, given that Wiessman attached suspicion not to a particular city but, instead, to the entire state of Florida. *See United States v. Digiovanni* 650 F.3d 498, 511–14 (4th Cir. 2011) (finding that driving a rental car from Florida on I–95, among other factors, failed to amount to reasonable suspicion), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

32

In any event, that the men rented a car in Florida is wholly innocuous when considering (as we must) the totality of the circumstances. Villavicencio and Rivero, after all, *live in Florida*. Both men presented valid Florida driver's licenses and, at the suppression hearing, Wiessman testified to her understanding that the men were "from Florida" and "heading back to Florida." J.A. 198.

If anything, it would have been suspicious had the vehicle been rented anywhere *but* Florida. Indeed, we considered that precise situation in *United States v. Brugal*, where the defendant had rented a vehicle in Miami but produced a New York driver's license. 209 F.3d 353, 360 (4th Cir. 2000). That discrepancy contributed to the officer's reasonable suspicion that the defendant flew from New York to Miami in order to buy drugs, rent a car, and drive back to New York. *Id.* By contrast, here, the vehicle's rental location merely corroborated Villavicencio's explanation for travel: the pair traveled to North Carolina from Florida to meet female friends.

### B.

The majority next relies on Villavicencio's "nervous" behavior. Of course, "unusually nervous behavior" is relevant to reasonable suspicion. *United States v. Mayo*, 361 F.3d 802, 808 (4th Cir. 2004). But "[a]s this court has recognized on multiple occasions, a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018). Thus, "absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *United States v. Massenburg*, 654 F.3d 480, 490 (4th

33

Cir. 2011) (cleaned up); *see also United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (noting that nervousness "is an unreliable indicator, especially in the context of a traffic stop").

Nothing in this record points to any indicia of nervousness beyond the norm. Wiessman testified that Villavicencio seemed nervous while sitting in her patrol car because he was "breathing really funny," "squirming in his seat," and smiling in a way that seemed "forced." J.A. 170. She also found it abnormal for someone in her patrol car "to sit there in the seat while [she is] checking their information" and "you know, smile at [her]." J.A. 157.

Although Wiessman may have found this behavior odd, little (if anything) about it suggests an unusual or exceptional level of nervousness indicative of criminal activity. *See Bowman*, 884 F.3d at 214–16 (defendant's trembling hands, failure to make eye contact, inability to sit still while in the patrol car, and visibly pulsating carotid artery don't constitute suspicious level of nervousness); *see also Massenburg*, 654 F.3d at 484, 490–91 (defendant's inability to make eye contact, refusal to consent to search, and "stand-offish" behavior don't constitute suspicious level of nervousness).

Indeed, the dashcam footage, which includes the audio of the conversation between Wiessman and Villavicencio, shows that the two shared a relatively comfortable rapport. They laugh together when Wiessman calls Villavicencio's travel plans "loco," for instance, and make friendly small talk about their shared fondness for German Shepherds. It strains credulity to label such behavior as exceptional nervousness indicative of criminal activity.

34

*See Bowman*, 884 F.3d at 215 (review of dashcam footage discounted officer's observation that defendant behaved in nervous manner during traffic stop).

For this reason, I'm also unpersuaded by the majority's observation that Villavicencio's behavior "did not subside" after he received a warning ticket.[2] Maj. Op. 22. As the very cases cited by the majority make clear, it's suspicious when *unusual* or *exceptional* nervousness persists throughout a stop—not when otherwise innocuous behavior remains unchanged. *See United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (finding it relevant that defendant's "unusually nervous" behavior didn't subside over the course of the stop)[3]; *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (finding it relevant that defendant's "exceptionally nervous" behavior didn't subside over the course of the stop).

## C.

The majority next points to Wiessman's observation that there were four cellphones in the center console of the car. Oftentimes, Wiessman testified, drug traffickers have one personal cellphone and another "known as a business phone or a burner phone or something

---

[2] It's also unclear whether Villavicencio, whose limited ability to speak English was flagged at the beginning of the stop, understood Wiessman's attempt to explain in "mixed English [and] Spanish" that she was writing him a warning ticket. J.A. 156.

[3] The majority later says that the facts of this case are largely in line with those in *Mason*, where we affirmed a finding of reasonable suspicion. But it omits mention of two substantial indicators of criminal activity found in *Mason* that are absent here: first, that the officer was "immediately struck by an 'extreme' odor of air fresheners" emanating from the car when the defendants were pulled over; and, second that the defendants answered the officer's questions in a manner that was clearly false (their answers conflicted with each other and with the officer's observation of items in the car). *Mason,* 628 F.3d at 126, 129.

35

that they would easily get rid of or discard." J.A. 169. The majority credits this observation, relying on our decision in *United States v. Vaughan* for the proposition that four cellphones are suspicious when possessed by two individuals. *See* 700 F.3d 705, 712 (4th Cir. 2012). But the majority overlooks that our holding in *Vaughan* was expressly limited to the peculiar situation in which an officer observes multiple cellphones, *some of which are prepaid*.

In *Vaughan*, the officer observed that two men possessed four phones of "multiple types." *Id.* The labels on two of the phones indicated that they were prepaid. *Id.* at 707. And prepaid phones, the officer testified, were often used by those involved in drug trafficking because they can be purchased without identification. *Id.* Acknowledging that the affordability of prepaid phones also attracts innocent buyers, we qualified our holding to the unique circumstances where the "vehicle occupants possess both types of phones." *Id.* at 712. We concluded, "It is thus sufficient to hold that where four cellular phones are present in a car with just two people, *and at least two of those phones are of the pre-paid type known to the detaining officer to be associated with narcotics trafficking*, the presence of the phones constitutes a valid factor in a reasonable suspicion analysis." *Id.* (emphasis added).

This case is far afield from *Vaughan*. Despite Wiessman's field experience with "burner" phones, J.A. 169, she couldn't say whether any of the phones—let alone two— were of the burner or prepaid variety. Thus, the factors we deemed suspicious in *Vaughan*—possessing one phone that can be cheaply and anonymously replaced, alongside another phone that requires a long-term contract—are wholly absent here. At the

36

suppression hearing, Wiessman testified that (in her experience) a second phone was typically a "business" or "burner" phone, *id.*, but she offered no explanation for why such a phone was indicative of criminal, rather than legitimate, business.[4] I find such rank speculation on the part of the trooper to be of minimal value in assessing reasonable suspicion.

## D.

The majority also relies on Villavicencio's inability to recall details of his travels. Villavicencio told Wiessman that he was traveling to North Carolina to visit female friends, but he couldn't provide the name of the town or hotel where he had stayed. He told Wiessman that he didn't speak English well and referred her instead to the car's GPS and his hotel receipt. In the majority's view, this exchange gave Wiessman reason to suspect that "either Villavicencio did not know where in North Carolina he had been or that he did not want her to know." Maj. Op. 24.

Evasive behavior is relevant to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (finding that "[h]eadlong flight," which "is the consummate act of evasion," is "suggestive" of criminal activity). But offering an alternative source for the information requested by an officer isn't evasive. Indeed, we rejected this very contention in *Bowman.* There, the defendant was pulled over after he had picked up a friend from the

---

[4] Wiessman conceded that innocent motorists might possess an additional phone for legitimate business but testified that such individuals would "tell [her] this is the work phone, et cetera." J.A. 235. However, Wiessman later clarified that, in fact, she never asked the men why they each possessed an additional phone, and she also admitted that legitimate businessmen wouldn't "have to" provide such an explanation. J.A. 239.

home of the friend's girlfriend. *Id.* at 206. When questioned by the officer, the defendant could recall neither the girlfriend's name nor where she lived. *Id.* at 207. Instead, the defendant estimated that he'd been driving for about thirty minutes and referred the officer to the car's GPS. *Id.* We rejected the notion that this response was suspicious, reasoning that it's "perfectly consistent with innocent travel for a person to rely on a GPS system to navigate and still not know precisely where he had been." *Id.* at 217.

So too here. When Villavicencio couldn't recall where he had visited, he referred Wiessman not only to the car's GPS coordinates (as the defendant did in *Bowman*) but also to his hotel receipt. Far from trying to evade the question, Villavicencio offered Wiessman two sources for the information that she requested. If anything, Villavicencio's inability to recall these details is even more innocuous than in *Bowman*. In *Bowman*, the defendant had been pulled over in his home state, had driven only 30 minutes from his destination, and had no apparent difficulty conversing with the trooper. *Id.* at 206–07. Villavicencio, by contrast, traveled to North Carolina from Florida, which helps explain why he may have been unfamiliar with the area, and repeatedly indicated that he had difficulty speaking English.[5]

---

[5] Wiessman claimed that Villavicencio was intentionally downplaying his ability to speak English because, before entering her patrol car, he had understood her requests to provide a driver's license and give consent to a frisk. But there's no indication that Villavicencio was comfortably speaking English during those interactions, and, regardless, Wiessman was told at the very beginning of the stop that Villavicencio's English was limited. In any event, whether Villavicencio was downplaying his ability to speak English is largely irrelevant, given that he provided the information requested via two different sources.

## II.

None of the above factors, standing alone, arouse reasonable suspicion. But factors that appear innocuous in isolation may nonetheless amount in the aggregate to reasonable suspicion. *United States v. McCoy*, 513 F.3d 405, 413–14 (4th Cir. 2008). This is so if the facts "in their totality serve to eliminate a substantial portion of innocent travelers," such that the "detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *Williams*, 808 F.3d at 246 (cleaned up).

The majority hangs its hat on this principle and, in particular, the notion that the circumstances amount to a generally strange travel itinerary. As the majority opinion summarizes:

> [M]ost innocent travelers would not spend $630 to rent a vehicle in Orlando, Florida, proceed to drive most of the night and into the next morning to a sparsely populated area in North Carolina, which they had no familiarity with, to visit girls for approximately 24 hours before driving back to Florida.

Maj. Op. 24–25.[6] At the suppression hearing, Wiessman described her view of the circumstances similarly: "They drove all the way from Florida and stayed at a hotel one night and turned back around and left. That wasn't normal. That was not normal travel, not normal itinerary, two men to take off like that in the middle of the night like that." J.A. 237.

---

[6] The majority makes much of the $630 cost of the rental, but I note (as Wiessman testified), that this was an estimated charge, which assumed that the car would be rented from a Monday night to a Thursday morning.

I question how unusual it is for longtime friends to rent an expensive car, drive out of state, and meet female friends for a night. But even if I'm wrong about that, I nonetheless can't agree that these facts reasonably point to criminal activity. Reasonable suspicion requires the government to articulate "a connection between the relevant facts and *criminal* activity." *Williams*, 808 F.3d at 253 (emphasis added). After all, "[w]ere it otherwise, an experienced police officer's recitation of some facts, followed simply by a legal catchphrase, would allow the infringement of individual rights with impunity." *Id.*

Here, the government fails to provide that link, repeatedly characterizing these circumstances as "not normal," Appellee's Br. 10, 11, without explaining how they are criminal. When asked what suspicions she had of *criminal* activity to prolong the stop, Wiessman testified,

> I was thinking drugs. I was. I thought potentially there's drugs in this vehicle, possibly concealed. Because when I went up to the vehicle, I didn't see any drugs, so possibly concealed drugs. Could have been money. The way he was acting, it could have been money. It could have been weapons. It could have been a lot of things. But I knew, based on his activity and the way that he was trying to kind of mask or cover, it was definitely criminal activity [a]foot . . . .

J.A. 166. In other words, we're presented here with a hunch, followed by a legal catchphrase.[7]

---

[7] For this reason, *United States v. Sokolow*, 490 U.S. 1 (1989) is inapposite. There, the Court held that a DEA agent had reasonable suspicion to stop a defendant in an airport based on the agent's observation that the defendant (among other things) paid thousands of dollars in cash for a flight departing that same day, traveled under an alias, checked no luggage, followed an evasive and erratic path through the airport, and took a 20 hour round-trip flight to spend 48 hours in Miami. *Id.* at 3–4, 8. Such behavior, the agent subsequently testified, "had all the aspects of a drug courier." *Id.* at 10 & n.11.

In the past, we've prudently declined to find reasonable suspicion where the government fails to offer "concrete reasons" why vaguely strange circumstances "combine into a suspicious conglomeration." *Bowman*, 884 F.3d at 219. In *Digiovanni*, for instance, we refused to find reasonable suspicion where the defendant flew into Florida, rented a car to drive to the Northeast on I–95, provided a strange travel itinerary involving multiple stops, and behaved nervously. 650 F.3d at 511–13. Acknowledging that these circumstances were unusual, we nonetheless found there to be no reasonable suspicion because the government failed to link the "unusual travel itinerary" to anything beyond "the facts that [the defendant] rented a car from a source state, was stopped on I–95, and was initially nervous." *Id.* at 513. After all, "[s]uch facts, without more, simply do not eliminate a substantial portion of innocent travelers." *Id.*

Likewise, in *Bowman*, we found that there wasn't reasonable suspicion to prolong a stop where the driver was pulled over for speeding and swerving at 3:40 a.m., couldn't recall the location that he was returning from, told the officer that he had recently purchased multiple vehicles despite having been laid off from his job, and behaved nervously. 884 F.3d at 214–18. Even assuming that those factors were, in their totality, "vaguely suspicious," we concluded that reasonable suspicion was lacking because the government "failed to articulate why [the] behavior is likely to be indicative of some more sinister activity." *Id.* at 218–19 (cleaned up).

And finally, in *Williams*, we declined to find reasonable suspicion where the defendant was stopped while driving a rental car on a drug corridor at 12:37 a.m., provided an address for his warning ticket that didn't match the address of his driver's license, and

41

provided travel details that conflicted with the terms of his rental car agreement. 808 F.3d at 247, 253. Despite the detaining officer's "conclusory" statements that such circumstances are "commonly associated with those that are involved in criminal activity," we vacated the defendant's conviction because "the prosecution is obliged to present evidence articulating reasonable suspicion." *Id.* at 253 (cleaned up).

While we "do not question the experience of [police] officers," we require them to "apply their experience so that the courts can make informed decisions on whether their suspicions are reasonable." *Id.* (cleaned up). And while it's possible for "individually innocuous factors to add up to reasonable suspicion," it's nonetheless "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Bowman*, 884 F.3d at 219.

Because no such reasons exist on this record, I respectfully dissent.